# H. & E. IVES

## *v.*

## MATTHIAS HARTLEY.

1. CONTRACTS—*whether a sale, or a deposit for storage.* The owner of a lot of wheat delivered the same to a miller, and received a receipt therefor, as follows: "Received of Matthias Hartley, to be stored, $150\frac{46}{60}$ bushels wheat, to take market price when he sees fit to sell." Another receipt as follows: "Received of Matthias Hartley, $134\frac{55}{60}$ bushels wheat left in store, to take market price when he sees fit to sell:" *Held,* that the form of the receipt implied a sale of the wheat, and not merely a deposit for storage.

2. Aside from these receipts, it appeared the wheat, when delivered, was placed in the private warehouse of the miller, among other grain, where the miller kept his own grain purchased for milling purposes; nothing was said about storing; the miller stated the price he was paying, and the owner asked him if he would take the wheat and pay for it when called for. The wheat was manufactured into flour and sold by the miller. Afterwards the mill was destroyed by fire, subsequent to which, on the inquiry of the party delivering the wheat, whether the miller would pay for it, the latter promised to do so; and the former received some flour in part payment therefor. It was *held,* that these circumstances attending the transaction, taken in connection with the receipt, show it was a sale of the grain.

3. PRIVATE WAREHOUSEMAN—*character of his obligation.* In case of a storage of grain by a private warehouseman, in the absence of any agreement on the subject, the inference would be that he was to keep it in the condition in which he received it, and, if mixed with his own grain, by consent of the owner, that it shall remain with the warehouseman until demanded.

4. ASSUMPSIT—*waiver of tort.* Where a person puts grain in a warehouse, for the purpose of storage, and the warehouseman converts the grain to his own use, by manufacturing the same into flour, and selling the same, receiving the money therefor, the owner of the grain may waive the tort, and recover from the warehouseman in assumpsit for money had and received, for the value of the grain.

APPEAL from the Circuit Court of Woodford county; the Hon. S. L. RICHMOND, Judge, presiding.

This was an action of assumpsit, brought in the court below, by Hartley, against H. & E. Ives, to recover the value of a quantity of wheat stored with the defendant, and not returned or accounted for.

It appears the defendants owned a warehouse, which was used by them in connection with their mill, for the purpose of storing grain purchased by them to be manufactured into flour.

A portion of the wheat in controversy was delivered by the plaintiff, and the residue by one Skinner, who received a due bill therefor from the defendant, which he indorsed to the plaintiff.

The due bill given to Skinner, and the receipts given to the plaintiff, were as follows:

EL PASO, February 5th, 1868.

Received of Matthias Hartley, to be stored, $150\frac{46}{60}$ bushels wheat, to take market price when he sees fit to sell.

H. & E. IVES.

EL PASO, February 23d, 1868.

Due Ayres L. Skinner or order, for $29\frac{20}{60}$ bushels wheat left in store, to take market price in March.

H. & E. IVES.

Indorsed, AYRES L. SKINNER.

EL PASO, February 19th, 1868.

Received of Matthias Hartley $134\frac{55}{60}$ bushels wheat left in store, to take market price when he sees fit to sell.

H. & E. IVES.

When the wheat was received by the defendants, it was placed in their private warehouse, among other grain which was there.

The circumstances attending the transaction, tending to show the character of the contract—whether a sale of the

wheat, or only a storing of the same—are made to appear by the testimony, which will be found in the opinion of the court.

A trial of the cause resulted in a verdict and judgment for the plaintiff. The defendants appeal.

Messrs. INGERSOLL & McCUNE and Messrs. HARPER & CASSELL, for the appellants.

Mr. GEORGE H. KETTELLE, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of assumpsit, brought by appellee in the Woodford circuit court, against appellants, to recover a quantity of wheat stored with the appellants, and not returned or accounted for by them. Appellee swears that he delivered the wheat, and received receipts therefor from appellants; that Ives said he was paying from $1.90 to $1.95 per bushel for wheat; that he asked Ives if he would take the wheat and pay for it when called for by appellee; that nothing was said about storing the wheat when it was delivered; that it was put amongst other wheat; that after the mill was burned, he asked Ives if he would pay for the wheat, and he answered that he would; that again, in May, he desired a settlement, and Ives said he did not have time, but would look at the market prices and fix it up, and when called upon in June he gave appellee no satisfactory answer in reference to the matter; that appellee got the flour of fifteen bushels in part pay for the wheat; that no time was fixed for appellee to sell, and nothing was said about storing the wheat.

Appellee further testified that Ives informed him that he had ground the wheat into flour and sent it to Chicago and sold it; that wheat was worth $1.90 per bushel at the time the mill was burned; that he was to have whatever the wheat was worth at El Paso, according to grade, when he chose to fix the price.

The two receipts given appellee were for wheat left in store, to take the market price when he chose to sell, but the receipt, as it is called by witnesses, which was given to Skinner, was. a due bill·for wheat left in store, and Skinner was to take the market price in March, and it was indorsed to appellee. Bowlby testified that he was present at a conversation before the mill was burned; that he heard Ives, on a request by appellee to furnish him with flour, say he would as leave let him have flour as money; that he had ground the wheat into flour and shipped it to Chicago, and had received the money for it. Snead testified that on the day after the mill was burned, he heard Ives say to appellee he need not be uneasy about losing.his wheat.

On the other side, it is insisted that the wheat was only received on storage, and that it was mixed in the other wheat; and appellants had more than enough of wheat of the same grade to have returned it, and would have done so had it been demanded. We have been unable to find any evidence in the record from which it can be inferred that appellants were public warehousemen, or that there was any agreement that appellants should use the wheat and return other wheat of equal grade when required. The warehouse, so far as we can see, was for the use of the mill, and it appears that the grain was taken from it by elevators into the mill to be ground. There is no evidence that appellee was to pay anything for storage, or that other persons were in the habit of paying. There appears to be no evidence that this was a public warehouse, or that appellants were such warehousemen. The receipts do not indicate it, and we must conclude that it was a private warehouse, in which appellants stored their own grain as they purchased it for milling purposes.

The form of the receipts implies a sale. They state that the wheat was left in store until appellee sees fit to take the market price. They do not declare that the wheat will be returned on demand, or shipped and sold on account of appellee, but to remain in store until he will take the market price. When may

he be willing to sell the wheat? Take the market price from whom? Appellants, of course. In other words, appellants received the wheat and were to pay the market price when appellee chose to fix the price. Otherwise why manufacture the wheat into flour and sell it? But even if this is not the true construction of the receipts, appellants had no right to convert the property to their own use, and, having done so, they must account for the property or the proceeds. If they wrongfully converted the property, appellee had the right to waive the tort and sue for the money received on the sale of the grain.

It is, however, urged that inasmuch as the grain was mixed with other wheat, it implied that similar grain was to be returned when required. The receipts do not so state, nor does any witness say that such was the understanding or agreement of the parties. In the absence of all agreement on the subject, the inference would be, in case of storage of grain by a private warehouseman, that he would keep it in the condition in which he receives it, and if mixed with his grain, by consent of the owner, that it shall remain with such warehouseman until demanded.

We do not think the recognition of liability, and the agreement by appellants to pay for the wheat after it was burned, is explained away by Ives' statement that he supposed it was a flour contract. At any rate, it did not satisfy the jury. And having received appellee's wheat, manufactured it into flour, and sold it and received the money, there was an ample consideration to support the promise. After a careful consideration of all the evidence in this case, we are satisfied that the finding of the jury is right, and that there is no error in this record, and the judgment of the court below must be affirmed.

*Judgment affirmed.*